Good morning, your honors. May it please the court, my name is Jonathan Edelstein and I represent the defendant appellant Billy Miranda Flores. I will do my best to reserve five minutes for rebuttal. Your honors, this court has repeatedly recognized the inherent and necessary imprecision of estimating drug quantity. And in the Scheel and Culp's cases, it is held uniquely among circuits that a district judge is required to take into account the margin of error in the data when making an estimate of drug quantity. And that any discount the district court gives to allow for the uncertainty of the estimate has to comport with the uncertainty in the margin of error. This case involves the mother of all margins of error. There were three cooperating witnesses who testified at trial for the government. And they testified to what was more or less a mom and pop operation. That there would be a few people lined up at the shop at any given time. That most of them were casual purchasers who bought one to three pills. That the defendant would obtain OxyContin by purchasing prescriptions from other people, which is not a high volume method. Tiny Bean Flores testified that he would essentially take over the defendant's business on weekends, which is the busiest time. And that 100 to 300 pills would usually last him the whole weekend. Now, on the other hand, you had Danny Sherwood, who went to trial with the defendant, and who then cooperated at sentencing in an attempt to obtain leniency for himself. And he came up with 1,000 pills a day. This thing's an assembly line. Now, one of these things is not like the others. And when you have that much of a discrepancy between the prosecution's trial witnesses and the prosecution's sentencing witness. We're not talking about defense witnesses versus government witnesses. This is between the government's own witnesses. When there is that much of a discrepancy, this is something that under Culp's and Scheel, the court has to take into account. Now, and especially where the physical evidence and the surveillance comports more with the mom-and-pop type operation than it does with the Danny Sherwood 1,000 pills a day operation. That this smoke shop was raided by law enforcement. Mr. Flores had no warning that law enforcement was coming. What quantity of OxyContin was found in the smoke shop at the time? None. His house, which was raided at the same time. They found a few empty pill bottles of OxyContin with prescriptions in other people's names, obviously prescriptions he had purchased. And a small quantity of OxyContin for which he had a personal prescription for which he was not charged. Now, if Mr. Flores was the kind of drug dealer that had 1,000 pills a day, you know, and always had thousands of pills in stock to service that type of business. What are the odds that there would be nothing in the smoke shop when the raid occurred? This creates a margin of error. Likewise, the surveillance on the poll camera showed that at some times there were people lined up and at other times traffic was pretty light. Not an assembly line. Now, the government will no doubt argue that this is an issue of credibility. That the district court credited Danny Sherwood, decided not to credit the other witnesses or decided to harmonize it in some way. But credibility does not eliminate margin of error. If a court were to find, for instance, that Danny Sherwood is 6 out of 10 on credibility and that Tiny Bean Flores was only 4 out of 10. Can't understand why a court would do that, but suppose that it did. That still doesn't eliminate the possibility that Mr. Sherwood is wrong or is lying or that Mr. Bean Flores was telling the truth. 6 out of 10 is not 10 out of 10. Credibility does not eliminate margins of error. And with the margins of error in this case being so sweeping that between Tiny Bean Flores' testimony of 100 to 300 pills lasts the weekend. And Danny Sherwood's testimony of 1,000 pills a day. And keep in mind, your honors, that Tiny Bean Flores was part of the conspiracy over a time period overlapping when Danny Sherwood was part of it. That this margin of error, 10 to 1, 20 to 1, has to be accounted for in the discount that's given to the drug quantity. And that there is a sufficient uncertainty at the very least to require a reduction to the next sentence and guideline level down. Also, with respect to the sentence and guidelines, there is an absence of findings of fact to support the use of a minor enhancement. Now, there was a dispute over whether Shelby Ingham was part of the conspiracy when she was a minor. And also, defendant's counsel put into issue whether the defendant affirmatively acted to involve her in the conspiracy. The sentencing court made no findings of fact. Said it was going to apply the enhancement. Didn't resolve the factual dispute and didn't even adopt the pre-sentence report. Simply made a conclusory statement that the enhancement applied. We have cited case law in the briefs. I would submit that it's well settled that this is enough in itself to require, at the very least, a remand for fact finding. And did the government ask for the enhancement for the use of a minor? Well, the probation department recommended the enhancement and the government argued in support of it. And the probation department initially said in the pre-sentence report, in paragraph 25, that Ingham was addicted to the pills and became a member of the defendant's distribution conspiracy by obtaining the OxyContin pills from him and redistributing and reselling them in order to obtain pills for her own use. And as defense counsel in the district court pointed out, that does not establish a factual predicate on a couple of grounds. First of all, it doesn't speak to the issue of whether the defendant affirmatively acted to involve Ms. Ingham in the conspiracy. Because, as this court says in the Parker case, there is not an across-the-board enhancement for committing a crime with a minor. You have to show that the defendant took affirmative action to include the minor. And if this discussion, this sentence in the PSR is actually more consistent with her coming to him rather than with him recruiting her, and in addition, it essentially is saying that she purchased pills from him for her own business. Which, as this court has also said, did not make her a co-conspirator at that point. Maybe later on she started selling pills on consignment for him and became a co-conspirator. But the PSR doesn't provide a factual predicate for that and it certainly doesn't specify when this happened. Whether it was before or after she turned 18. And the probation department responded to the objections by an addendum to the pre-sentence report, which apparently relied on information that was contained in Shelby Ingham's pre-sentence report, to which, of course, the defendant has no access because PSRs are confidential. And they say, another sentence here, Flores provided a residence and vehicle for Ingham, who was the youngest member of the conspiracy and barely 17 when she became involved with OxyContin and met Flores. That, again, does not show when she joined the conspiracy. She was 17 when she got involved with pills, which she was before she met Mr. Flores, and she was 17 when she met the defendant, Mr. Flores. This sentence doesn't speak to the issue of whether he took an affirmative action to involve her in the conspiracy or whether, in contrast, she came to him. Nor does it say whether she was still 17, 18, or more than that, when she graduated from an addict to then someone who had her own independent pill business with him as a supplier, and then finally to a member of the conspiracy. And neither the PSR nor anything in the trial record provides a sufficient factual predicate for this sentencing enhancement. And, again, the sentencing court didn't even adopt the PSR. The sentencing court made no findings of fact whatsoever, simply a conclusory statement, I'm applying the enhancement. And we would submit on those grounds that, and in the others stated in the briefs, that neither the drug quantity enhancement nor the use of a minor enhancement can be supported on this record. Now, one more thing I would like to discuss before I reserve time, which is the sufficiency as to the gun count. We're certainly not arguing that the evidence is insufficient as to the drug counts. He admitted on the stand, Mr. Flores acknowledged, that he conspired to sell OxyContin, that he possessed methadone with intent to distribute, and certainly we are not arguing that those counts should be reversed. However, the gun count is in a very specific posture because of the way that it was charged. The defendant was not charged with possessing a gun in furtherance of the OxyContin conspiracy or in furtherance of his drug business in general. He was charged with possession specifically in furtherance of Count 25. Count 25 consisted of the possession of, with intent to distribute, of methadone pills on October 20, 2009. So, in order to sustain the charge, the government was required to prove, not simply that the defendant had guns in connection with his drug business, but that he had this gun specifically in connection with this possession of methadone. And we would submit that on this record that was not proven. First of all, there was no proof that he even had the methadone in his possession when he had that gun or that he was contemplating obtaining that particular quantity of methadone when he obtained the gun. I thought the gun was found in a desk drawer a foot away from the safe containing the methadone pills. In a drawer that contained ammunition that was for a .22 caliber rifle, Your Honor. That this was essentially a storage drawer. Where was the .44 Magnum found? The .44 Magnum was found in the desk drawer to the left of the safe. And it was also loaded? It was loaded, yes. But, and your client's story is, well, my father just pledged his collateral for a loan. Well, whether, I mean, that was my client's testimony and his father's. But regardless of whether it was collateral or whether it was there for some other reason, the evidence is very clear that guns came and went. That at a couple of points other witnesses saw him with another gun that was not kept in the desk drawer, it was kept in a safe, which obviously isn't a place where it would be ready to reach in case of an emergency. There was testimony, affirmative testimony, that these witnesses never saw him with a gun during any drug transaction. Well, he told his, what, half-brother Tiny Bean that, in relation to another small black gun, that the gun was in the drawer if needed for anything, right? And that was another gun at another time. Mr. Bean Flores was, had ceased to participate in this conspiracy by the time the .44 Magnum came into the defendant's possession. That there was a succession of guns and there were periods when he didn't have a gun. And certainly if this defendant was possessing guns in furtherance of his overall drug business and, you know, needed, you know, thought that it was important to have a gun at all times to protect himself, there wouldn't be interruptions in the period when he had a gun. And in addition, he wouldn't have kept the prior guns in a safe because, you know, someone comes in to rob the smoke shop and the gun's in a safe, you're not going to be able to reach it in order to protect the staff. So... Go ahead. But that's the point. I mean, here, I mean, he claims, oh, this was just, I was just holding this .44 Magnum, it was collateral from my, loaned to my father, and yet the gun's loaded. Well, why would you have a loaded gun if it's just collateral? Why wouldn't you lock it in the safe? Why would you have it in an open drawer a foot away from these pills? I mean, it just sounds a little fishy, doesn't it? If it's not for, in fact, protection against being robbed by other criminals when you're in the drug business. Well, I would submit, Your Honor, that in contrast to that, this was a location where when the smoke shop was raided, no drugs were found other than the small quantity of methadone. And if he's keeping a .44 Magnum to protect his drugs, you figure he would keep it where the drugs are. You figure he would keep it on his person or wherever he is, you know, carrying these pills at the time. And I would submit, you know, there's certainly, this is certainly not a case where there's no evidence that might connect the gun and the methadone. We're not saying that there's no evidence whatsoever, but our position is that the circumstantial evidence here doesn't add up to proof beyond a reasonable doubt, and that this, you know, on this basis, the gun charge, unlike the drug charges, requires reversal. If there's nothing further, I'll reserve the balance of my time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm T.L. Luthie Miller, an Assistant United States Attorney representing the United States. Flores's contention that there was insufficient evidence to support his conviction for possessing the .44 Magnum on the methadone trafficking offense ignores the facts this Court has just referred to. To satisfy the in-further request, of the 924C count, this Court has said that where the underlying drug offense is possession with intent to distribute, and that's the underlying drug offense here, the government has provided adequate evidence of a nexus between the firearm and the drug crime by showing the firearm is in the same room and within easy reach of a substantial quantity of drugs and drug paraphernalia. That's what we have here. Three hundred and thirty-two methadone pills, my opponent just called that a small amount of drugs. It's more than a quantity for personal use. It's a large quantity of drugs. The gun was, as Judge Gilman referenced, a foot away. It was loaded. It was in an unlocked drawer. More to the point. Opposing counsel also mentions the date in the indictment, on or about October 20, 2009, in the possession with intent to distribute. Does there need to be evidence that that gun, the .44 Magnum, was there on that date? Yes, and there is such evidence because that's the date on which both the gun and the drugs were found. That's the date on which Mr. Flores was arrested and this upstairs office of the smoke shop was searched. And what's critically important here, there are two extra facts that are critically important here to showing that there was enough to establish the infertile element. One is this was the base of operations for Billy Flores' pill sales. Both Tiny Bean Flores and Leslie Larson testified that this is where he sold drugs. Tiny Bean Flores acknowledged, both of them acknowledged, that methadone was a smaller part of his pill sales than OxyContin, but Tiny Bean Flores specifically testified that he kept and sold methadone in this safe and from this office. And the second piece of critical evidence is the testimony that's also been referred to already, which is that he advised his co-conspirators to be smart and arm themselves. If you look at page 160 of the supplemental excerpts of record, this is pretty compelling testimony in support of the Inferno's charge. This is Dennis Hilsendegger, who was one of the co-conspirators. He said, we had conversations about guns, but the conversation that sticks out most to me is when he asked if I had a weapon. This is probably after a month of me selling the 50 or 100 pills when I was in there constantly. He had asked me if I had a weapon, if I was smart about things, and I said, yeah. He continued, what we were talking about was he wanted to make sure that I was being smart and I had protection with me. Because you were a drug dealer? I assume that's the reason, yes. In light of this evidence, the conviction on account of the 924C charge should be affirmed. Addressing the sentencing contentions, unless the court has any more questions about the 924C charge, the drug quantity enhancement, counsel is right that the court was required to be conservative, and the court was conservative. Counsel has pointed out to the one piece of evidence, singled out the one piece of evidence that might suggest a quantity lower than 85 pills a day. If you look at footnote 2 on page 60 of our brief, we explain that to get him into the next lowest base offense level, he has to show that he was selling fewer than 85 milligram pills a day. And he simply can't get there with this evidence without some Herculean assumptions and ignoring lots of evidence that this business was bigger. That evidence includes just looking at Tiny Bean Flores' testimony, yes, he testified 100 or 300 pills a week, but he also testified that on three out of the 10 to 11 occasions he substituted for Mr. Flores, he needed to call and get more pills. And additionally, he testified, he estimated that he made in a weekend $5,000, and he said he was earning $5 a pill from the sales he did for Mr. Flores. That means he sold 1,000 pills that weekend. So his testimony wasn't consistently low. Opposing counsel is asking you to just look at the smallest estimate. Mr. Sherwood said 1,000. The case agent estimated 1,500 pills a day. Leslie Larson and Dennis Hilsendegger, who's dealing overlapped, estimated between, I think, 200 and 600 pills a day. So there's the district court accepted the testimony of Sherwood, which was sworn testimony subject to cross-examination, and under the Voight case, this court has said that establishes, that's sufficient to support a quantity determination. And the district court halved that and said 500 pills a day. At 500 pills a day, he's nowhere near the next lower base offense level. That would be true if, in fact, the conspiracy started in, what, December of 2007? That's right, Your Honor. That's a little fishy right there, isn't it? I mean, it might have not been until January or February of 2008. Your Honor, Mr. Flores himself testified that he started dealing in 2007, and Hilsendegger and Larson both said that they met him in late 2007 or the beginning of 2008 and started buying from him. And that testimony, the case agent, this investigation had begun by mid-2008. So there was something going on here that caused law enforcement, two different law enforcement agencies, the South Sound Drug Task Force and the DEA had separately started investigating this business in 2008. So the idea that it was nonexistent and then suddenly by mid-2008, there are two law enforcement agencies investigating it seems low. But even if you think that the estimate should have been somewhat later in 2008, and it can't get much later than January 2008, we still are way above the marijuana equivalency of 30,000 kilograms. Right, if you're using the 500 pills a day. Even if you're using less than 500 pills a day. At 500 pills a day, it's something like 259,000 kilograms. So we're way away from getting to a lower base offense level. One more piece of evidence as to drug quantity, two more pieces, I'm sorry. One, in a three-month period, in the beginning of the first three months of 2009, Mr. Flores made 40,000 telephone calls. And both Larson and Agent Watry, who bought in the fall of 2008, testified that there were lines of people at the office to see Mr. Flores to buy pills. What about the minor issue, Shelby? Yes, Your Honor. Shelby Ingham's sentencing memorandum, the memorandum she filed with the court at her sentencing, which was part of this same criminal case, says that her birth date is July 9th, 1991. That sentencing memorandum is part of the record here and part of what the district court was aware of when he sentenced Ms. Ingham. So the defendant didn't say she wasn't 18 in the summer of 2009. He didn't say we think her birth date is at some other point. He just said there's no evidence to say when she turned 18. That assertion was wrong, both because of what the district court was aware of from her sentencing memorandum, but also from defendant's own testimony. He testified that she turned 18 like four months before his arrest on October 20th, 2009. That means he admitted he knew when she turned 18. He affirmatively denied developing a sexual relationship with her before she turned 18, but he didn't affirmatively deny conspiring with her before he turned 18. He said something about, I believe, this is at 354 of the record, I believe she was around 18. What's the evidence that she was involved in the conspiracy, even if we assume that the July, I guess it would be July 2009? Yes. Date was in the record, assuming that was in the record, which I'm not sure about. What's the evidence that she was involved in the conspiracy before that date? Your Honor, Tiny Bean Flores testified that he stopped selling drugs for Mr. Flores in May or June of 2009. Danny Sherwood testified that it was May of 2009 because he said he took over for Tiny Bean Flores in May of 2009. And Tiny Bean Flores testified that he sold to Shelby Ingham for Mr. Flores. So she was buying from this conspiracy. But that doesn't make her a conspirator, right? Buying alone doesn't make her a conspirator, but there is other evidence which supports the district court's finding on this, which was a preponderance of the evidence finding. What was that evidence? The evidence is that he purchased a car and provided housing for her in the summer of 2009. So we know she was his girlfriend. I think there was evidence in the record about that. Yes. So that also doesn't show she's a conspirator. No, but it shows – She can't be selling or doing something in furtherance of the conspiracy. She was selling. She did make three sales for this conspiracy after she turned 18. So you would have to assume that somehow magically mid-summer 2009, when she turned 18, she suddenly turned from a buyer to a conspirator. And the evidence is such that it was within the district court's power to find that the evidence suggested she was involved, she was more involved than that, because someone doesn't go from being a casual purchaser to having a car, having a place to live, and selling in such a short period of time. Now, the district court made no actual finding as to her age, did it? The district court's finding was cryptic. There's no question about it. But if you look at page 527 of the record, well, first of all, at the beginning of the hearing, he noted that this fact was a dispute. So he was aware that there was a dispute. And then he found that he mentioned the dispute. He resolved the dispute in a couple of different places. If you look at 516 of the record, after defense counsel had made his presentation about sentencing, but before the government's counsel started, the judge says, there's a two-level increase on use of a person under 18. I know that from, I know her, and I know the circumstances. And then at 527 of the record, he said, a two-level increase for use of a person younger than 18 applies. So that's enough in this case for him to resolve that dispute, because they hadn't put on any contrary evidence. Doesn't that just show his knowledge of the law, rather than the facts which demonstrate that she was under 18? Well, I think his statement on page 516 just says, I'm aware of the record in this case. I know her. He sentenced her. So he knew what the situation was, and that was what he was saying. And under CARTI. He said that the law would permit an enhancement if she was under 18. Well, no, he's actually finding here that the enhancement applies at 527. Well, I'm troubled by the fact that it's hard for me to see any factual determination by him as to what he relied upon, that she was under 18 when she joined this conspiracy. Your Honor, I agree that it's cryptic, but at 516, he says, I know her. He's saying, I sentenced her. I know what the facts are in this case. I heard the trial testimony, which includes testimony about her birthday. Well, how does that help us as to his findings? Because his finding is supported by a preponderance of the evidence, and under the CARTI and RITA cases, this Court assumes that a court in sentencing has looked at the case as sort of ‑‑ it doesn't require a full explanation. This Court has approved some pretty cryptic statements at sentencing, statements like this one. And as long as they're supported by the record, and this one is. So just so I understand, the evidence in this record, since the evidence of her proceedings is not in this record, the evidence in this record that supports the district court's finding, if that's what it was, is her sales after the conspiracy, which raised an inference in light of her relationship to Mr. Flores before her birthday, that she was also involved in the conspiracy. Is that correct? That's correct. And the fact that we know she was buying from Tiny Bean Flores in May. Okay. And, in fact, she was Dennis Hilsendegger's girlfriend in 2008, and he was part of this conspiracy. So she was part of this circle for a while. And he acknowledges, Mr. Flores testified that he met her in November or December of 2008. So there's a long period of time where she's ‑‑ the evidence suggests she was a purchaser, and then she becomes much more involved in that summer. And Mr. Flores explained that once Leslie Larson stopped being his girlfriend, Leslie Larson and Shelby Ingham had some sort of disagreement, and so Leslie didn't want him to see Shelby Ingham. But once Leslie Larson dropped out of the picture, she came in. So Ms. Ingham came in and became his girlfriend. Out of an abundance of caution, in closing, I want to note that opposing counsel says that if you remand on the question of youth of a minor, you should do it on a closed record, and he cites an Eighth Circuit case for that proposition. This Court has rejected that proposition in the case of the United States against Matthews. I'll provide the citation. It's 278 F. 3rd. 880. This Court said, as a general matter, if a district court errs in sentencing, we will remand for resentencing on an open record, that is, without limitation on the evidence that the district court may consider. If there are no further questions, we ask that the conviction and sentence be affirmed. Thank you. Your Honors, briefly, there is no dispute that Mr. Flores knew Shelby Ingham before she turned 18 and that they had a personal relationship. That's not what the dispute over the sentencing enhancement is about. What it's about is whether the government proved that she had graduated to becoming part of the conspiracy by that time, and as Your Honor correctly pointed out, the fact that she bought drugs for her own business, for her own resale, does not make her a co-conspirator. So, at some point in May, she's buying drugs for herself. She's not a co-conspirator. Then, in August, after she turns 18, she's apparently become a co-conspirator, and the transition must have happened at some point between May and August, but there's no evidence as to whether it was before or after July 9th, and the government is asking this court to affirm a finding that was based on speculation. It's based on flipping a coin. Was it before July 9th? Was it after July 9th? There's nothing in the record that would enlighten us on that. There is also nothing in the record to enlighten this court on whether the defendant took any affirmative action to involve her in the conspiracy, which is what is required, not just that she's a part of it. Maybe she was brought into it by Tiny Bean Flores or by Danny Sherwood. There's no evidence showing who brought her into this, whose idea it was. This court in the Parker case has said that it's not enough just that you commit a crime with a minor and that you profit off the minor. This defendant has to have taken affirmative action to involve the minor. Why is this not harmless? Even if you subtract the two-level enhancement, the sentencing range would have still been 292 to 365 months, and the sentence for the drug offense was only 180 months. Well, what this court found in the... It went way below the range anyway, the district judge. Well, what this court held in the Munoz-Camarena case, which is cited in the briefs, is that the fact that somebody receives a non-guideline sentence or even the fact that a judge, even if a judge were to say, I would give exactly the same sentence if not for the guideline, if I were found to have committed an error in the guideline application, it still cannot be concluded to be harmless. And I would submit that under Munoz-Camarena, a remand is required here because even if the defendant got a below-guideline sentence on the drug offense, this use of a minor certainly factored into the sentencing calculus. He might have gotten a sentence further below the guidelines if this enhancement hadn't applied. And also, with respect to the government's statement that the district judge said, I know her, the fact that the district judge knows her is not evidence of record in this case. It's not something that appears on the record that can be reviewed by this court. So I would submit that at the very minimum, a remand is required on the use of a minor issue. And then as to the drug quantity issue, the government, you know, in the very brief time I have remaining, the government says, all right, on three out of ten or eleven occasions, Tiny Bean Flores needed more pills, which means on seven or eight occasions he didn't. And in addition to the duration of the conspiracy, which this court, which Your Honor pointed out, there's also the issue of whether the conspiracy was constant or whether it grew over time. You had Dennis Hilsendegger and Leslie Larson, you know, testifying about how in the early days this was the defendant purchasing prescriptions, selling a few pills at a time. There would only be a few people lined up in the shop at any given point. Maybe it grew later. But that was not taken into account by the court in arriving at its estimate. And since I'm now out of time, I will rest on the briefs and will submit the case with the permission of Your Honors. Thank you. Thank you for your arguments. The case of the United States v. Billy Miranda Flores is submitted. And we are adjourned for the day and for the week. Thank you. Thank you.
judges: Alarcon, Gilman, Ikuta